IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| NUECES PETROLEUM CORPORATION | § | CASE NO: 05-44617 |
|     Debtor(s) | § | |
| | § | CHAPTER  11 |
| | § | |
| RICHARD W. BREITHAUPT | § | |
|     Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-3696 |
| | § | |
| NUECES PETROLEUM CORPORATION | § | |
|     Defendant(s) | § | |

## MEMORANDUM OPINION

This adversary proceeding was called to trial on January 31, 2007. Plaintiffs were lessors under an oil and gas lease dated June 14, 2002. Nueces Petroleum Corporation, the debtor in bankruptcy case 05-44617, was the lessee under the lease. Plaintiffs seek a declaration that the oil and gas lease is terminated. After consideration of the evidence, the Court concludes that the oil and gas lease is terminated.

### Jurisdiction and Venue

The Nueces bankruptcy estate claims its interest as a lessee as the principal asset of the bankruptcy estate. The outcome of this adversary proceeding will affect the estate's assets and liabilities and will affect the estate's ability to reorganize. Accordingly, this Court has jurisdiction of this matter under 28 U.S.C. § 1334. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

### The Lease

The June 14, 2002 oil and gas lease has a primary term of one year from the effective date of the lease. To continue the lease past the primary term, the debtor must maintain oil or

gas production in paying quantities or meet the requirements of one of the lease's savings clauses. The lease contains four provisions material to the outcome of this proceeding. Those provisions are contained in paragraphs 2(a), 2(b), 2(c) and 9 of the lease. Paragraph 2(a) establishes the primary term of the lease and the conditions under which the primary term is extended. It reads, in its entirety, as follows:

> Subject to the other provisions herein contained, this lease shall be for a term of one (1) year from the effective date hereof (called "primary term") and as long thereafter as oil or gas is produced from said lands in paying quantities, or this lease is maintained in force by virtue of some other provisions hereof. If within thirty (30) days prior to the expiration of the primary term hereof, or at any time or from time to time after the expiration of the primary term hereof, oil or gas is being produced from said lands and all production ceases and this lease is not otherwise continued in force, this lease shall not terminate if additional drilling or reworking operations are commenced or resumed on said lands within ninety (90) days after such cessation of production, and this lease shall continue in force so long as any such operations on the same or successive wells are prosecuted in good faith and in a workmanlike manner with no cessation of more than ninety (90) consecutive days; and, if such operations result in production of oil or gas, then this lease shall, subject to the other provisions hereof, continue in force as long thereafter as oil or gas is produced from said lands in paying quantities. If at the expiration of the primary term of this lease oil or gas is not being produced from said lands but Lessee is then engaged in drilling or reworking operations thereon or Lessee shall have completed a well thereon within thirty (30) days prior to the end of the primary term (and whether such well be a dry hole, a well producing oil and/or gas or a well capable of producing gas but shut-in) then this lease shall remain in force so long as operations on such well or drilling or reworking operations on any additional well are prosecuted in good faith and in a workmanlike manner with no cessation of more than ninety (90) consecutive days; and, if any such operations result in production of oil or gas, so long thereafter as oil or gas is produced from said lands in paying quantities, subject however, to the other provisions hereof.

Paragraph 2(b) is not in dispute. In general, it provides that the lease automatically terminates after the primary term unless there are paying quantities being produced or there are continuous drilling or reworking operations.

Paragraph 2(c) defines the meaning of certain terms set forth in paragraph 2(a). It reads as follows:

The term "drilling operations" whenever used in this lease shall mean and include operations conducted in good faith for drilling a well, reworking operations, and reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well. For all purposes under this lease, drilling operations shall be deemed to be prosecuted with reasonable diligence when prosecuted without cessation of more than thirty (30) consecutive days or when no more than ninety (90) consecutive days elapse between the completion of operations at one well or location and the commencement of drilling operations at another well or location. A well shall be deemed to be completed under the provisions of this lease (i) three (3) days after the well reaches total depth in the event no attempt is made to complete the well as a producer of oil and/or gas by the running of production casing (a dry hole) or (ii) thirty (30) days after the date production casing is cemented in the well (as reflected by the cementing affidavit required to be filed with the Railroad Commission of Texas) in the event an attempt is made to complete the well as a producer of oil and/or gas.

Paragraph 9 contains a force majeure provision, as follows:

When any of the operations contemplated by this lease are delayed or interrupted by operation of force majeure including storm, flood or other act of God, fire, war, rebellion, insurrection, riot, or as a result of some order, requisition, or necessity of any governmental agency having jurisdiction, the time of such delay or interruption shall not be counted against Lessee. All express or implied covenants or conditions of this lease shall be subject to all valid federal and state laws, executive orders, rules or regulations of any governmental agency, state or federal, having jurisdictions, and this lease shall not be terminated in whole or in part, and Lessee shall not be liable in damages for failure to comply therewith, if compliance is prevented from, by or if such failure is a result of any such law, order, rule or regulation. If from any such cause, Lessee is prevented from conducting drilling or reworking operations or producing oil or gas from said lands, the time during which Lessee is so prevented shall not be counted against Lessee, and this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such operations. It is provided, however, that no such law, rule, order or regulation shall eliminate the necessity for, nor extend the time within which rentals, royalties, and other payments provided for herein are to be paid.

## Production

The plaintiffs' exhibits 13 and 14 set forth the oil and gas production on the lease since its inception. Exhibits 13 and 14 were admitted into evidence without objection. They reflect the reports filed by the debtor with the Texas Railroad Commission. Nueces alleges that some of

its more recent reports (since June 2006) have been amended to reflect some amount of production from the wells. No evidence was offered as to the extent of the production.

The plaintiffs' expert witness (Mr. Robertson) testified that the debtor has failed to obtain production in paying quantities as required to continue the lease past its primary term. In general, Mr. Robertson testified that the determination as to whether paying quantities exist should be reached by examining the revenues available from the sale of produced oil and gas compared to the operating costs required to produce the oil and gas. In making his determination, Mr. Robertson calculated paying quantities by summing multiple months' revenues and costs, excluding certain fixed costs. Mr. Robertson's calculations show that paying quantities, as required under the lease, did not exist.

The debtor questioned that Mr. Robertson's methodology, using multiple months, produced an unfair result. The debtor asserted that paying quantities should have been determined on a monthly basis. However even if the debtor is correct, the debtor would still fail to show it met production in paying quantities sufficient to maintain the lease. There were many months when the lease produced no oil and gas whatsoever. During the entire primary term of the lease, there was no production. There was production (although not in paying quantities) between September 2003 and October 2004. Production ceased and resumed sporadically through September 2005. From October 2005 through June 2006, there was no production.

Mr. Robertson testified that there was a minimum monthly cost of $1,000 per month per well during any period of production and that the price of oil did not exceed $47 per barrel prior to March 2005. That testimony was not disputed.

Although the Court finds that Mr. Robertson's methodology of examining production over a reasonable period of time is correct (and thus there was never production in paying

quantities as necessary to maintain the lease), even use of a monthly analysis, as the debtor asserts is the proper method, would reflect that paying quantities existed only in:

- October 2003
- January 2004
- February 2004
- April 2004
- May 2004
- June 2004
- July 2004
- August 2004
- September 2004
- October 2004

Using the debtor's monthly analysis method, there were no paying quantities in the primary term.  There were also no paying quantities in:

- July 2003
- August 2003
- September 2003
- November 2003
- December 2003
- March 2004
- November 2004
- December 2004
- January 2005

- February 2005.

There is no evidence as to whether there were paying quantities after February 2005, for months in which there was production (no witness testified regarding the price of oil).  However, there was no production at all in

- June 2005
- October 2005
- November 2005
- December 2005
- January 2006
- February 2006
- March 2006
- April 2006
- May 2006
- June 2006.

The Court concludes that the wells were not producing in paying quantities.  Indeed, it is apparent that there were many months when the wells were not producing at all.

Nevertheless, the lease would have remained effective if the lessee either (i) was excused from performance on account of the force majeure clause; or (ii) engaged in qualified drilling operations (as defined in paragraph 2(c) of the lease) during the periods of non-production.

## Force Majeure

The lands under the lease are located on the banks of the Lavaca River.  The leased property is considered an area of wetlands under the jurisdiction of the Corps of Engineers of the United States Army.  In periods of exceptionally high tides and Southerly winds, the land floods.

When there are releases from spillways on the Lavaca River, the land floods. When hurricanes strike, the land floods.

Severe floods can last for up to two weeks. With a single exception, no evidence was submitted to the court that identified the dates on which flooding occurred or the dates on which acts of God should have excused performance by Nueces. The single exception was Hurricane Claudette. Claudette struck the area on or about July 15, 2003. Although the extent of disruption caused by Claudette is disputed, the debtor did not cease its operations until July 31, 2003. The debtor alleges that work resumed sometime prior to September 18, 2003. Claudette was the type of event that satisfied the force majeure provision of the contract.[1] The debtor was entitled to a suspension of its obligations under the lease during this time.

The debtor believes that the force majeure clause should excuse its performance on the multiple occasions there was flooding on the property. However, the debtor did not introduce any evidence as to the dates of any other events or the extent of the delay caused by any of the other events.

The rule in Texas is that the party alleging force majeure bears the burden of proof. *Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427 (Tex.App.-Amarillo 1993, no writ). Moreover, it is established law that the burden with respect to a matter concerning facts that are peculiarly within the knowledge of one party will rest on that party. *Campbell v. U.S.*, 365 U.S. 85, 96 (1961). "Burden-shifting where one party has superior access to evidence on a particular issue is a common feature of our law." *In re One Parcel of Prop. Located at 194 Quaker Farms Rd., Oxford, Conn.,* 85 F.3d 985, 990 (2nd Cir. 1996) (citing JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 337, at 570 (94th ed. 1992)). In this case, the

---

[1] The evidence is undisputed that there are surrounding oil and gas leases in the area. None of the other leases were required to suspend their operations at any time since the date of the lease. Nevertheless, based on the totality of the evidence presented to the Court, the debtor's performance during this period was suspended.

lessee was in a unique position to know what effects any matters governed by the force majeure clause had on the operations and whether the force majeure clause was properly invoked. The debtor failed to meet that burden.

Accordingly, the debtor's obligations under the lease were suspended only during the period necessitated by Hurricane Claudette.

## Continuous Operations

The debtor alleges that its continuous work on drilling operations maintained the life of the lease. Drilling operations include "drilling a well, reworking operations, and reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well." Lease, ¶ 9.

However, drilling operations must be undertaken "in good faith and in a workmanlike manner." Lease, ¶ 2(a).

The testimony conflicts as to whether the debtor conducted its operations in a workmanlike manner. Mr. Hill, sole shareholder of the debtor, testified that his work was conducted in a workmanlike manner. Mr. Hill's expert testified that it was not possible to know whether the work was conducted in a workmanlike manner, but that on the one instance that he observed Mr. Hill's operations, the work had been done in a workmanlike manner.

Mr. Perryman was a consultant on the project. He testified that he witnessed gross breaches of established operating procedures. According to Mr. Perryman, the debtor halted an ongoing drilling project on well 1F in order to avoid paying overtime. This led to a failure at the drilling operations that caused downhole pipe to be permanently stuck. Mr. Robertson, an individual with substantial experience, reviewed the records of the operations and concluded that Mr. Hill's operations were not conducted in a workmanlike manner.

The lease contains 42 well bores. Of those, it is undisputed that 40 are not in compliance with Texas Railroad Commission requirements. The Court has difficulty reconciling non-compliance on 40 out of 42 wells with workmanlike performance on the lease.

The Court reviewed extensive photographs of well sites and other locations on the lease. There were numerous and obvious deficiencies. Dirt had been removed to build roads or berms and the area with the removed dirt left exposed pipe. Valves were rusted. Switch boxes were missing controls. Pipes were disconnected in some areas. The debtor offered little explanation. The Court concludes that the substantial deterioration is the result of a shortage of funds and competence.

The Court concludes that the work being performed by the debtor has not been competently managed and has not been performed in a workmanlike manner.

As with the force majeure issue, the debtor bore the burden of proving that it performed in a workmanlike manner. *Campbell v. U.S.*, 365 U.S. 85, 96, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). However, even if the burden of proof was on the lessor-plaintiffs, that burden would have been well-satisfied.

## Conclusion

The lessee under the lease has failed to meet the requirements to keep the lease in force. It has terminated by its own terms. A separate judgment will issue.

Signed at Houston, Texas, on February 2, 2007

_____
MARVIN ISGUR
United States Bankruptcy Judge